STATE of Iowa, Appellee,

v.

Russell Wendall MITCHELL, Appellant.

No. 96–51.

Supreme Court of Iowa.

July 23, 1997.

third degree when (1) the person performs a sex act with another who is fourteen or fifteen years of age, (2) the person is five or more years older than the other participant, and (3) at the time the person and the other participant are not cohabiting as husband and wife.

Mitchell appeals on six grounds: (1) the district court abused its discretion when it prohibited him from eliciting testimony about the alleged victim's sexually transmitted diseases; (2) the district court violated Mitchell's Sixth Amendment rights in prohibiting him from eliciting testimony about the alleged victim's sexually transmitted diseases; (3) the district court improperly admitted hearsay evidence as to the age of the alleged victim; (4) the district court erred in interpreting the statute as to the age requirement; (5) the district court erred in refusing to give Mitchell's proposed jury instructions on credibility; and (6) there was insufficient evidence to support his conviction. We affirm.

### I. *Background Facts.*

The alleged victim, R.C.S., was a runaway at the time of her alleged sexual abuse. She was living at a private home with drug users and other runaways. In March 1995 R.C.S. was fifteen. She had been (1) physically abused, (2) diagnosed with several psychological disorders, and (3) institutionalized repeatedly. This is when she first met Mitchell.

At trial R.C.S testified as follows. Around 2 a.m. on March 5, 1995, Mitchell began to make sexual advances toward R.C.S. He had done this before. R.C.S. then went to a back bedroom to nap. Mitchell followed her in shortly. Mitchell forced her to have sexual intercourse with him. Steve Yarnell and Jeremy Christensen, who were both present at all relevant times, testified that they were in a room next door and saw Mitchell enter the back bedroom where R.C.S. had gone and then leave with his pants down.

At various times thereafter, R.C.S. stated or wrote that up to eight men and one woman had sexually abused her during her stay at the private home. When R.C.S. eventual-

David A. Lemanski, Dubuque, for appellant.

Thomas J. Miller, Attorney General, Sheryl A. Soich, Assistant Attorney General, Fred H. McCaw, County Attorney, and Christine O. Corken, Assistant County Attorney, for appellee.

Considered by McGIVERIN, C.J., and LAVORATO, NEUMAN, ANDREASEN, and TERNUS, JJ.

LAVORATO, Justice.

The defendant, Russell Wendall Mitchell, appeals from his conviction and sentence of sexual abuse in the third degree. The jury convicted Mitchell of violating Iowa Code section 709.4(2)(c)(4) (1995). Under this provision a person commits sexual abuse in the

ly returned home, she told her mother what had allegedly happened to her, and the mother notified the police.

The State charged seven persons, including Mitchell, with sexually abusing R.C.S. Mitchell was charged with sexual abuse in the third degree pursuant to Iowa Code section 709.4(2)(c)(4).

Before trial, Mitchell filed a motion and offer of proof pursuant to Iowa Rule of Evidence 412 regarding R.C.S.'s sexually transmitted diseases. Following a hearing, the district court denied the motion.

During trial and over Mitchell's objections, the district court allowed testimony of R.C.S.'s age. Because R.C.S. had been adopted and no one who testified about her age had been at her birth, Mitchell argued that the challenged testimony was inadmissible hearsay.

The district court also denied Mitchell's motion for judgment of acquittal based on the insufficiency of evidence supporting the charge. Later, the court refused to give Mitchell's requested instructions on credibility of the witnesses.

The jury convicted Mitchell, and the district court sentenced him to an indeterminate sentence of ten years. *See* Iowa Code §§ 709.4, 902.3, 902.9(3).

## II. *Iowa Rule of Evidence 412.*

In two motions filed pursuant to Iowa Rule of Evidence 412, Mitchell sought to introduce evidence that R.C.S. had one strain of gonorrhea and Mitchell had another. He also sought to introduce evidence that R.C.S. had trichomoniasis and a yeast infection and Mitchell did not. Medical testimony established that gonorrhea, trichomoniasis, and yeast infection are sexually transmitted diseases (STDs). Of the three, only the yeast infection may be contracted by means other than sexual contact. Mitchell contends here that the district court abused its discretion in denying the motions.

Rule 412, Iowa's rape shield law, prohibits in a sexual abuse case "reputation or opinion evidence of the past sexual behavior of an alleged victim of such sexual abuse." Iowa R. Evid. 412(a). The rule also prohibits in a sexual abuse case "evidence of a victim's past sexual behavior other than reputation or opinion evidence" unless "such evidence other than reputation or opinion evidence" is evidence of "past sexual behavior with persons other than the accused, offered by the accused upon the issue of whether the accused was or was not, with respect to the alleged victim, the source of semen or injury." Iowa R. Evid. 412(b)(2)(A).

In addition, the rule prohibits evidence of the "victim's past sexual behavior other than reputation or opinion evidence" unless "such evidence other than reputation or opinion evidence is ... constitutionally required to be admitted." Iowa R. Evid. 412(b)(1).

A. *Source of injury.* Mitchell asserted in the district court, without objection from the State, that the STDs were "injuries" pursuant to rule 412(b)(2)(A). The court treated them as such for the purposes of its ruling. We likewise do so here. In substance, Mitchell argues that he should have been allowed to show he was not the source of R.C.S.'s "injuries"—the STDs.

On this issue Mitchell made the following offer of proof. On March 14—nine days after the alleged sexual abuse—R.C.S. tested positive for trichomoniasis and gonorrhea beta lactamase positive. She also had a yeast infection. On March 15, Charles Evans, one of R.C.S.'s alleged sexual abusers, was also tested for sexually transmitted diseases. Tests showed that Evans had the same strain of gonorrhea that R.C.S. had. The district court did not allow any of this evidence before the jury.

On March 19 Mitchell was also tested and had none of the diseases that R.C.S. had. Mitchell, however, did have gonorrhea beta lactamase negative, a different strain from the one R.C.S. and Evans had. Thus, if Mitchell and R.C.S had engaged in intercourse apparently neither gave the other any diseases.

Mitchell's medical expert, who has expertise in the area of infectious diseases, gave deposition testimony before trial. The expert testified that the possibility of Mitchell becoming infected with the strain of gonorrhea with which R.C.S was afflicted was ap-

proximately twenty to thirty percent. The jury never heard this evidence.

The expert also testified in his deposition that a male infected by gonorrhea will infect a woman between eighty and ninety percent of the time. The jury heard this evidence.

The expert further testified that the possibility of a yeast infection being transmitted from a female to a male is between five and ten percent. The chances of transmitting trichomoniasis is thirty to fifty percent. The jury never heard this evidence.

In sum, the jury knew that (1) a male infected by gonorrhea will infect a woman between eighty and ninety percent of the time and (2) R.C.S. did not have gonorrhea beta lactamase negative but Mitchell did. The jury was prohibited from knowing that R.C.S. and Evans had gonorrhea beta lactamase positive. The jury was also prohibited from knowing (1) that R.C.S. had trichomoniasis and a yeast infection and (2) the possibilities of a female transmitting the two diseases to a male.

Based on this information, Mitchell argues that the jury only heard one side of the equation—that it was virtually impossible for him not to give R.C.S. the strain he had; they did not hear that it was possible for R.C.S. to give Mitchell her strain. Thus, he concludes, the excluded scientific evidence about the STDs tended to show he had no sexual contact with R.C.S., and the district court denied him the opportunity to present that evidence to the jury.

 Our review on the admissibility of rule 412 evidence on the source of injury is for abuse of discretion. *State v. Gettier*, 438 N.W.2d 1, 3 (Iowa 1989). We reverse only if the district court abuses that discretion. *Id.* We find an abuse of discretion only when the district court exercises its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable. *State v. Knox*, 536 N.W.2d 735, 738 (Iowa 1995).

 We begin our analysis by noting that rape shield laws like Iowa's rule 412 were enacted to (1) protect the privacy of victims, (2) encourage reporting, and (3) prevent time-consuming and distracting inquiry into collateral matters. *State v. Ogilvie*, 310

N.W.2d 192, 195 (Iowa 1981). An accused may attempt to offer evidence of the victim's past sexual behavior either to confront real evidence—as Mitchell contends here—or to impugn the victim's character. *Id.* In either case, the victim's privacy is invaded and for that reason the rule applies. *Id.* In short, whether the evidence is admissible does not depend on the motive for the inquiry. *Id.*

As mentioned, the State and the district court proceeded on the basis that the STDs—although evidence of R.C.S.'s past sexual behavior—fit the injury exception of rule 412. The district court acknowledged the evidence had some relevancy but went on to rule that the evidence was inadmissible on the following alternative grounds:

> Evidence of the defendant's freedom from an STD has some relevance on whether there was sexual contact but not much. It has low probative value because it can't be established with reasonable clarity that the victim had the STD at the time of the alleged contact. Most importantly, even if she had an STD, it is probable and likely that the defendant would not catch it from her during intercourse. Thus, the absence of an STD is very weak proof that no abuse occurred. Balanced against the low probative value is the highly inflammatory aspect of the inquiry into venereal disease. Such questions would have a high potential to harass, annoy and humiliate the witness. Finally, allowing such questions would certainly be time-consuming and distract the inquiry by focusing on the victim's conduct rather than the defendant's. In light of the low probative value and high potential for prejudice, such evidence is not admissible.

In this part of its ruling, the district court was performing the balancing test called for in rule 412(c)(3):

> If the court determines ... that the evidence which the accused seeks to offer is relevant and that the probative value of such evidence outweighs the danger of unfair prejudice, such evidence shall be admissible in trial....

In *State v. Knox*, 536 N.W.2d 735, 738 (Iowa 1995), the defendant proffered evi-

dence that the complainant had chlamydia—a sexually transmitted disease—at the time of the alleged sexual abuse and he did not. He proffered this testimony to prove he did not engage in sexual intercourse with the complainant. The district court ruled the evidence inadmissible because it (1) had "very weak" probative value, (2) would violate rule 412 as evidence of a past sexual behavior, and (3) did not fit within the exceptions of rule 412. We elected not to decide the question whether the evidence fell within the parameters of rule 412. Rather we analyzed the evidence on the grounds of relevancy. *Knox,* 536 N.W.2d at 738. Utilizing the balancing test of Iowa Rule of Evidence 403, which mirrors the test in rule 412(c)(3) used by the district court here, we concluded the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. *Knox,* 536 N.W.2d at 739.

1. *Relevancy.* In *Knox* we concluded that the chlamydia evidence was weak in probative value for several reasons. First, a male has a thirty percent chance of contracting the disease from an infected female in a single act of intercourse. A female has a seventy percent chance of contracting the disease from an infected male. Next, use of condoms substantially reduces this risk. The possibility existed that the accused had used a condom because no seminal fluid was found in the complainant and the accused had condoms when arrested shortly after the incident. Last, the accused was tested three months after the incident. Because chlamydia is easily treated with widely available antibiotics, the accused could have been infected at the time of the incident but was cured when tested three months later. *Id.* at 738–39.

Similarly here, the probability that Mitchell would have contracted the STDs from R.C.S. in a single sexual contact was low. As mentioned, Mitchell's medical expert provided the following evidence as to the three diseases. The probability of a male contracting gonorrhea from an infected female in a single sexual contact is about twenty to thirty percent; for a yeast infection chances are between five and ten percent. A male's chances of contracting trichomoniasis from an infected female in a single sexual contact is a bit higher: thirty to fifty percent. But in the case of trichomoniasis a male will usually "self-clear" the infection in ten to fourteen days.

Additionally, Mitchell's expert could not say—without speculating—that R.C.S. was infected with any of the three diseases on the day of Mitchell's alleged sexual contact with R.C.S. All the testing on R.C.S. was done on March 14—some nine days after the alleged incident. And, as the district court noted, even if she had the STDs on the day of the alleged incident, the probabilities are that Mitchell would not have contracted the STDs during one sexual contact.

 Based on this evidence we hesitate to say that the STD evidence that was not admitted was even relevant. Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Iowa R. Evid. 401. The test is "whether the evidence offered would render the desired inference more probable than it would without such evidence." *State v. Alvey,* 458 N.W.2d 850, 852 (Iowa 1990). The foregoing testimony from Mitchell's expert does not establish to more than a fifty percent chance that Mitchell had no sexual contact with R.C.S.

Mitchell's expert also testified by deposition that a male will infect a female eighty to ninety percent of the time in a single sexual contact. As mentioned, the jury heard this testimony. The jury also heard testimony that (1) Mitchell tested positive for gonorrhea beta lactamase on March 19—two weeks after the alleged incident and (2) R.C.S. was not infected with Mitchell's strain of gonorrhea. This evidence was likewise weak in probative value because there was no evidence that Mitchell had the disease on the date of the alleged incident. Nevertheless, he did receive the benefit of this evidence, which we think was more damaging to the State's case than the evidence Mitchell complains was not admitted.

 Allowing this last bit of testimony testifies to the district court's careful applica-

tion of the rape shield law. Although the evidence was weak, the court gave Mitchell the benefit of the doubt, mainly, because the evidence did not tend to prove past sexual behavior on the part of R.C.S.

2. *Unfair prejudice.* Although we doubt the STD evidence that was not admitted was relevant, like the district court we proceed on the assumption such evidence had some relevancy on the issue of whether there was sexual contact. Evidence may be relevant, yet it may not be admissible if the probative value of such evidence is substantially outweighed by the danger of unfair prejudice. Iowa R. Evid. 412(c)(3). "Evidence is unfairly prejudicial if it may cause a jury to base its decision on something other than the established propositions in the case." *Knox,* 536 N.W.2d at 739. Evidence of the existence of venereal disease is highly inflammatory. *Id.*

■ In *Knox,* the complainant had only one venereal disease. Here R.C.S. had three. As in *Knox,* we conclude the excluded STD evidence "does not reach a level of probative force to warrant the inflammatory and prejudicial impacts upon the victim and the proceeding by its admission." *Id.* (citation omitted). There was just too much danger that the omitted STD evidence would brand R.C.S. as promiscuous in the eyes of the jury and for that reason not worthy of belief. The district court correctly pointed out that any questions along the lines of the omitted STD evidence would (1) potentially result in harassing, annoying, and humiliating R.C.S.; (2) be time-consuming; and (3) would distract the inquiry by focusing on R.C.S.'s conduct rather than Mitchell's. We conclude the district court did not abuse its discretion in denying the admission of the proffered STD evidence.

B. *Constitutional exception.* As mentioned, Mitchell also contends that the excluded STD evidence was admissible under the "constitutionally required to be admitted" exception of rule 412. Iowa R. Evid. 412(b)(1). In support of his contention, Mitchell argues that to disallow the STD evidence would deny him his Sixth Amendment right to confront the State's witness.

■ Because Mitchell alleges a constitutional violation, our review is de novo. *State v. Predka,* 555 N.W.2d 202, 205 (Iowa 1996).

The Sixth Amendment to the Federal Constitution provides that "the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. Mitchell argues that the district court's ruling denied him the right to present evidence and cross-examine R.C.S. with the evidence that she had the STDs and he had none.

■ We conclude that the district court did not violate Mitchell's Sixth Amendment rights in excluding the STD evidence. No constitutional violation occurs in excluding evidence unless such evidence is relevant. *Knox,* 536 N.W.2d at 741. As we said the excluded evidence was not relevant. Moreover, even relevant evidence is not constitutionally required to be admitted if the prejudicial effect of the evidence outweighs the probative value. *Id.* In addition to being irrelevant, the STD evidence was unfairly prejudicial.

III. *Hearsay Testimony Regarding Age of the Complainant.*

Mitchell next complains that the district court improperly admitted testimony regarding R.C.S.'s age. Both R.C.S. and her adoptive mother testified that R.C.S's birthday was May 1, 1979.

R.C.S.'s true date of birth is critical to the charge against Mitchell. At the time of the alleged abuse, R.C.S. was two months short of sixteen, the age beyond which the statute would unquestionably not apply. The adoptive mother testified that "[w]e found out about [R.C.S.] when she was eight days old and we picked her up when she was eleven days old." Had R.C.S. been born more than two months before May 1, 1979, the statute, of course, would not apply.

In admitting this evidence, the district court relied on Iowa Rule of Evidence 803(19), which provides:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . .

(19) **Reputation Concerning Personal or Family History.** Reputation among members of his family by blood, adoption, or marriage, or among his associates, or in the community, concerning a person's birth, adoption ... or other similar fact of his personal or family history.

 Exceptions to the general rule against hearsay are permitted with respect to pedigree where the declaration is by a relative or one in a position that he or she would likely know the facts. *In re Estate of Conner*, 240 Iowa 479, 484, 36 N.W.2d 833, 836 (1949). It is enough that the declarant had such opportunity for acquiring knowledge concerning the pedigree information as leads to a reasonable inference that the declarant possessed such knowledge. *In re Frey's Estate*, 207 Iowa 1229, 1234, 224 N.W. 597, 598–99 (1929); 31A C.J.S. *Evidence* § 301, at 563 (1996).

 Although R.C.S. was adopted, the declarant—the adoptive mother—was certainly in a position to know when R.C.S. was born. At the very least, the adoptive mother had the opportunity to acquire such knowledge, and that opportunity would permit a reasonable inference by the jury that she possessed such knowledge. The adoptive mother's testimony about R.C.S.'s birthday was therefore admissible under rule 803(19).

 R.C.S.'s testimony about her birthday was also admissible under rule 803(19). Concededly, such testimony is hearsay; however, evidence as to a witness' birth

is a fact of which he may be said to have knowledge based on family tradition. Such testimony has been regarded as original, direct, and primary evidence. It is admissible without regard to other or better evidence which has been introduced or which is available, and it is immaterial that the witness' parents are alive and available, or that they actually testify.

31A C.J.S. *Evidence* § 300(b), at 561–62 (1996). The rationale for the admission of such testimony is obvious:

Strictly speaking, one cannot know his exact age except upon hearsay information; for he is not capable of knowing this, or anything, until an appreciable time after

birth. But practically a person's belief on this point has a satisfactory basis. Courts have commonly preferred to accept this practical certainty rather than to insist on academic nicety.

*See State v. Tetrault*, 78 N.H. 14, 15, 95 A. 669, 670 (1915) (citation omitted).

The adoptive mother's presumptive knowledge of R.C.S.'s birthday constituted the family tradition and reputation supporting R.C.S.'s belief as to her age. Rule 803(19) is not limited to blood relatives but expressly includes members of the family by adoption.

IV. *Interpretation of the Statute as to the Age Requirement.*

Iowa Code section 709.4(2)(c) is commonly referred to as the statutory rape provision. It provides that a sex act between persons not cohabiting as husband and wife constitutes third-degree sexual abuse if the victim is "fourteen or fifteen years of age" and the defendant is "five or more years older than" the victim.

R.C.S. was fifteen years, ten months, and five days old on the date of her alleged sexual abuse. Thus, Mitchell argues, R.C.S. was not fifteen, but was in fact over fifteen and she ceased to be fifteen the day after her fifteenth birthday. Mitchell raised these arguments in his motion for judgment of acquittal, which the district court overruled.

 Mitchell's arguments raise a statutory interpretation question. Our scope of review involving the interpretation of a statute is at law. *State v. Haberer*, 532 N.W.2d 757, 758 (Iowa 1995).

For his remarkable position, Mitchell relies heavily on *Knott v. Rawlings*, 250 Iowa 892, 96 N.W.2d 900 (1959). In *Knott*, this court interpreted a statute that covered children "of the age of sixteen years, or under." *Knott*, 250 Iowa at 893, 96 N.W.2d at 901. The court was called upon to answer the question whether one who is sixteen years, six months, and three days old is "a child of the age of sixteen years, or under" within the contemplation of the statute. *Id.* at 894, 96 N.W.2d at 901. Answering the question in the negative, the court said:

A child is one year old on the first anniversary of his birth and is sixteen years old on the sixteenth anniversary. Before the sixteenth anniversary he is under the age of sixteen and after that anniversary he is over the age of sixteen. Sixteen years is an exact and definite period of time. It does not mean or include sixteen years and six months. We should be realistic and not read something into the statute which is not there and which clearly was not intended to be there. This is a criminal statute and cannot be added to by strained construction.

*Id.*

We agree with the State that *Knott* is distinguishable because the statute in *Knott* employed the language "sixteen years, or under" and the present statute reads "fifteen years of age." The words "or under" made it clear that the legislature did not intend to include anyone who was a day over sixteen. *Id.*

■ Moving to the present statute, we think the State's common usage example is convincing. A person's common response to a question about his or her age is to state only the age at the last anniversary of birth. One does not add the additional months and days over that anniversary. We think this is the sense in which the legislature used the words "fifteen years of age" in the present statute. Thus, "fifteen years of age" would include all the months and days over fifteen until the person reaches the sixteenth anniversary of his or her birth.

As the State points out, a contrary interpretation would yield an absurd result. The statute prohibits a sex act with a person "fourteen or fifteen years of age." Mitchell's interpretation would prohibit a defendant from having sexual intercourse with a young girl on her fourteenth birthday but would allow him to do so for the 364 days thereafter until she reaches her fifteenth birthday. The statute in *Knott* would not have produced a similar absurd result no matter how it was interpreted. *See State v. Green,* 470 N.W.2d 15, 18 (Iowa 1991) (holding that court interprets a statute to avoid absurd results even when a literal interpretation would yield a contrary result).

The district court correctly concluded that because R.C.S. had not yet reached her sixteenth birthday when the alleged sexual abuse occurred, she was fifteen years of age.

## V. *Instructions on Credibility.*

Mitchell proposed several instructions on credibility. The district court refused to give these instructions. Instead, the court gave the uniform jury instruction on credibility. *See* II Iowa Crim.Jury Instructions 100.7 (1988). Mitchell contends the court erred because the court's instruction on credibility does not impress upon the jury the importance of lying under oath as opposed to other lies.

■ We review jury instructions for errors at law. *State v. Kellogg,* 542 N.W.2d 514, 516 (Iowa 1996).

■ Trial courts need not instruct in the language of requested instructions so long as the topic is covered by the court's own instructions. *State v. Doss,* 355 N.W.2d 874, 881 (Iowa 1984). Moreover, trial courts should generally adhere to the uniform instructions. *State v. Hatter,* 414 N.W.2d 333, 336 (Iowa 1987).

■ We have carefully reviewed Mitchell's proposed instructions on credibility and compared them to the uniform instruction the court gave. We totally agree with the district court's following assessment in denying Mitchell's requested instructions:

The court believes that [the court's instruction on credibility] adequately covers all of the concepts contained in the defendant's requested instructions. The jury is told that they can believe all, part or none of any witness' testimony. They are told they can consider many factors in deciding what to believe. They are given examples. The examples include inconsistent statements, and inconsistent statements can be under oath or not under oath. The court sees no value to the jury in attempting to comment further on any of the particular aspects of the evidence received in this case.

You are certainly free to include in your argument to the jury that the evidence will not warrant some particular conclusion or will warrant some particular conclusion. In short, the court's instruction correctly conveyed to the jury all of the relevant concepts regarding credibility.

## VI. Sufficiency of the Evidence.

Mitchell's last contention is that the evidence was insufficient to sustain his conviction. Mitchell makes a three-part argument: (1) R.C.S.'s testimony is thoroughly self-contradictory and incredible; (2) there exists no credible corroboration of her allegations; (3) based on (1) and (2), the evidence against him is not sufficient to convict him. Mitchell also contends the State failed to prove that he and R.C.S. were not cohabiting as husband and wife, an element of the sexual abuse offense.

■ Our scope of review on an insufficiency-of-the-evidence challenge is on assigned error. Iowa R.App. P. 4. We uphold a verdict if there is substantial record evidence to support the charge. *State v. Aldape*, 307 N.W.2d 32, 39 (Iowa 1981).

■ When reviewing an insufficiency-of-the-evidence challenge, we view the evidence in the light most favorable to the State, including legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence. *State v. Bass*, 349 N.W.2d 498, 500 (Iowa 1984). In determining whether there is substantial evidence to convict, we must consider all of the evidence in the record and not just the evidence supporting the verdict. *Id.* Evidence is substantial if it would convince a rational factfinder that the defendant is guilty beyond a reasonable doubt. *State v. LeGear*, 346 N.W.2d 21, 23 (Iowa 1984).

As mentioned, the State charged Mitchell with violating Iowa Code section 709.4(2)(c)(4). Under this provision, the State had to prove that on the day of the alleged offense Mitchell (1) engaged in a sex act with R.C.S., who was fifteen years old, (2) was five years older than R.C.S., and (3) was not cohabiting with R.C.S. as husband and wife. The only issues left to resolve are whether the State proved Mitchell (1) engaged in a sex act with R.C.S. and (2) was not cohabiting with her as husband and wife.

A. *The sex act.* The sex act alleged was sexual intercourse. *See* Iowa Code § 702.17. On this issue R.C.S. testified as follows. Around 2 a.m. on March 5, 1995, Mitchell started to make "sexual advances" toward R.C.S. at the home of Lindsy Lenihan. He laid R.C.S. down on the living room floor and attempted to remove her pants.

R.C.S. then went into a back bedroom to nap; Mitchell followed her. She was part on and part off the bed when Mitchell pulled her pants down to her shins and placed her legs over his head, pushing them down with his hands so they came to rest around his waist. She was unable to move because her jeans were restricting her legs below the knees. As R.C.S. was lying on the bed, Mitchell was hovering directly above her, and took his pants down to insert his penis into her vagina. At some point during the intercourse, Ivy Fountain entered the bedroom, but quickly left when Mitchell yelled at him to get out.

Mitchell left the room after penetrating R.C.S., and, when he left the room, he did not have his pants on. R.C.S. believed that as Mitchell walked out of the bedroom, several other individuals—Steve Yarnell, Jeremy Christensen, Mario Wilcox, Ivy Fountain, and a man nicknamed "Stone"—were in the living room.

Mitchell contends the above testimony is not worthy of belief and should be disregarded. In support of his contention, Mitchell argues that R.C.S.'s testimony from beginning to end was inconsistent and self-contradictory. In addition, he argues, many of her statements were completely absurd. To support his claim Mitchell points to the prosecutor's own disbelief of her main witness and to R.C.S.'s pretrial statements.

In her opening statement, the prosecutor virtually conceded that R.C.S. was a liar:

You'll hear the testimony of [R.C.S.].... She'll testify about the lies. She'll testify about the manipulations. She'll testify about her friends. She lied to her friends. She will testify she lied to her mom. She

will testify that she lied to us. She will testify that she knows if people were to come in here, people that she believed to be friends of hers and were asked "what's [R.C.S.'s] reputation?" "My reputation is that I am a liar." She'll testify to that, she'll tell you all, she'll lay it all out.

In statements to her mother, examining doctors, and the police, R.C.S. was inconsistent about the number of men who raped her, when she was raped, how she was raped, what she was wearing when she was raped, and who the participants were when she was raped.

When R.C.S. told her mother about the rapes, the mother asked her to make a list of the people who raped her. R.C.S. listed only one person, and that person was not Mitchell. At one point, R.C.S. claimed that a total of eight men and one woman had sexually abused her.

 Generally, the credibility of witnesses is left to the jury. *Graham v. Chicago & N.W. Ry.*, 143 Iowa 604, 615, 119 N.W. 708, 711 (1909). There are, however, limitations upon the application of the rule. *Id.* For example, the testimony of a witness may be so impossible, absurd, and self-contradictory that the court should deem it a nullity. *Id.* (witness' testimony disregarded because witness testified at one trial and gave a different and self-contradictory account of the controlling facts at a second trial).

Later, this court explained the *Graham* rule further:

The rule that it is for the jury to reconcile the conflicting testimony of a witness does not apply where the only evidence in support of a controlling fact is that of a witness who so contradicts himself as to render finding of facts thereon a mere guess. We may concede that, ordinarily, contradictory statements of a witness do not make an issue of fact; and that such situation may deprive the testimony of all probative force.

*State ex rel. Mochnick v. Andrioli*, 216 Iowa 451, 453, 249 N.W. 379, 380 (1933). The court stopped short of nullifying the witness' testimony because there was other corroborating testimony to support her change in

testimony. *Id.* (in paternity case, trial court allowed State to reopen case and allow complaining witness to correct her testimony because apparently she was not familiar with the English language and was confused by the questions).

The most recent application of the *Graham* rule came in *State v. Smith*, 508 N.W.2d 101 (Iowa App.1993). In *Smith*, the State prosecuted the defendant for sexual abuse of his three minor stepdaughters. Our court of appeals reversed the convictions for sexual abuse and assault because of insufficient evidence. In doing so, the court disregarded the testimony of the three girls, explaining:

In the present case the only evidence against appellant is the statements and testimony of the three girls. When read separately or together, the accounts of alleged abuse are inconsistent, self-contradictory, lacking in experiential detail, and, at times, border on the absurd.

*Smith*, 508 N.W.2d at 103.

In *Smith*, the girls described incidents of abuse they said happened while the defendant's wife lay sleeping one foot away. They also testified that the abuse occurred during a birthday party while fifteen to eighteen people were in the same room, opening presents. *Id.* at 103–04. When asked about details, the girls responded, "I don't know" to almost all of the questions. *Id.* at 104. In addition, a careful medical examination of one of the girls revealed no physical evidence of abuse although she claimed the defendant had hurt her. *Id.*

Except for several omissions from the several lengthy recountings about the many misdeeds done to her, R.C.S. never wavered from her accusation against Mitchell. R.C.S. was somewhat inconsistent with her story about how she was abused by Mitchell, but she never changed the operative fact that she and Mitchell had sexual intercourse. R.C.S.'s testimony about Mitchell, at least, was never absurd or surreal. Whatever absurdities she may have spoken, she admitted upon questioning.

R.C.S.'s testimony was never as impossible as the testimony in *Smith*. In *Smith*, the convictions of abuse relied entirely on unde-

tailed allegations of abuse occurring in such places and at times as a family birthday with fifteen to eighteen people present or in a room where the mother lay sleeping only a foot away. R.C.S.'s allegations involved a home frequented by drug abusers and runaways. R.C.S.'s statements about repeated sexual assaults in this kind of environment was not at all absurd.

Unlike in *Smith*, there is corroboration of R.C.S.'s testimony. Both Steve Yarnell and Jeremy Christensen corroborated the critical facts of R.C.S.'s account at trial. Yarnell and Christensen testified they saw Mitchell enter the bedroom R.C.S. was in and saw him exit some ten to fifteen minutes later with his pants down. They also testified they saw R.C.S. exit the bedroom shortly thereafter, carrying bed sheets.

Other witnesses presented testimony that tended to corroborate aspects of R.C.S.'s testimony. Jason Smith testified Mitchell tried to get him to touch R.C.S. sexually while the three of them were in the back bedroom of the home where the alleged abuse by Mitchell later occurred.

A police officer testified that Victor O'Hara Sr., Lindsy Lenihan's uncle, picked Mitchell's picture from an array of photographs as one of three males he confronted in the back bedroom of Lenihan's home. This was shortly before the alleged abuse by Mitchell occurred. The three males were holding R.C.S. down on the bed at which point O'Hara told the three to leave and the three complied one by one.

Nineteen-year-old Lindsy Lenihan testified that she allowed R.C.S. and other runaways to stay at her home. She testified that several times before March 9, R.C.S. told her that Mitchell tried to force himself on her in the back bedroom of Lenihan's home. Lenihan also testified to a telephone call she received shortly after the alleged abuse by Mitchell:

A. Well, I got a call in Florida and they stated that it was Russell and [the defendant's] name was Russell … it was said that it wouldn't be in my best interest to testify. …

Q. And who told this to you? A. Russell Mitchell.

Q. Do you recognize Russell's voice on the phone? A. I knew it was a black man. [Mitchell is black.] I never really talked to Russell on the phone so I can't really answer to be sure.

Q. Did the person that you're talking to call himself Russell?

A. Yes.

Lenihan also testified that Mitchell admitted on the telephone that "he had slept with [R.C.S.]."

▇ Based on all of this evidence, we see no need to depart from our general rule of leaving the credibility of witnesses to the jury and allowing it to resolve inconsistencies as it sees fit. We conclude the evidence was sufficient to establish that a sex act occurred on March 5, 1995 between R.C.S. and Mitchell.

▇ B. *Cohabitation.* The final unresolved issue is Mitchell's claim that the State failed to prove he and R.C.S. were not cohabiting as husband and wife at the time of the alleged sexual abuse. We agree with the State that there was substantial record evidence from which the jury could reasonably infer that Mitchell and fifteen-year-old R.C.S. were not married to each other. According to R.C.S.'s testimony, she was living with her mother before the incident. She also testified she (1) had never met Mitchell before March 4, 1995 and (2) was introduced to him only after running away to Lenihan's home just before the alleged sexual abuse occurred. Finally, Kathy Kennedy testified that she was Mitchell's live-in girlfriend and they had maintained a fairly steady relationship for three years, a relationship that had produced one child.

VII. *Disposition.*

In sum, we conclude the district court was well within its discretion in disallowing the STD evidence. Disallowing the STD evidence did not violate Mitchell's Sixth Amendment right to confront the State's complaining witness. The court also correctly (1) allowed evidence as to R.C.S.'s age, (2) interpreted the statute as to the age requirement,

and (3) refused to give Mitchell's proposed jury instructions. Finally, the evidence was sufficient to support Mitchell's conviction. Accordingly, we affirm.

**AFFIRMED**.